

# FASULO, SHALLEY & DiMAGGIO L.L.P.
## ATTORNEYS AT LAW

LOUIS V. FASULO *
MARGARET M. SHALLEY
CHARLES DI MAGGIO
*ADMITTED NJ

March 21, 2012

**<u>VIA ECF AND FIRST CLASS MAIL</u>**
The Honorable Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

**Re:**   ***United States v. Giovanni Galluzzo***
**11 Cr. 030-21 (KAM)**

Dear Judge Matsumoto:

I represent the defendant, Giovanni Galluzzo, in the above referenced case. This letter is respectfully submitted pursuant to Rule 32 of the Federal Rules of Criminal Procedure and sets forth several matters that Mr. Galluzzo will raise to aid in the determination of the appropriate sentence, serving the interests of justice and the sentencing goals of 18 U.S.C. § 3553(a). Giovanni Galluzzo respectfully requests that the Court impose a sentence of 16 months incarceration, followed by a period of 8 months home confinement, pursuant to the Court's authority under *United States v. Booker*, 542 U.S. 220, 226-227 (2005) and 18 U.S.C. § 3553(a).

## <u>BACKGROUND</u>

Mr. Galluzzo stands before the Court as a devoted father, supportive husband and a man greatly appreciated by his immediate community. He has accepted responsibility for his actions and regrets that, as a consequence, he faces prolonged separation from his two children and wife, who need his support now more than ever. Attached as "Exhibit 1" is a letter from Melissa Galluzzo, the defendant's wife, wherein she expresses concern over having to raise the couple's children without the assistance of Mr. Galluzzo. This anxiety has been compounded by the fact that Mrs. Galluzzo is currently pregnant with the couple's third child. *See* Exhibit 1.

Mr. Galluzzo pled guilty to Counts 31 and 47 of a sixty-count indictment. (Presentencing Investigation Report Paragraph 1, hereinafter "PSR ¶"). Count 31 charges that Mr. Galluzzo, and others, engaged in a poker gambling operation, in violation of 18 U.S.C. §1955(a). (PSR ¶ 2). Count 47 additionally charges that Mr. Galluzzo conspired to use extortionate means to collect debt from another individual, in violation of 18 U.S.C. § 894(a)(1). (PSR ¶ 3). Notably, only two of the remaining 58 counts in the indictment name Mr. Galluzzo as a defendant, and none of his charges are predicated on acts of racketeering. (PSR ¶ 1).

Giovanni Galluzzo was born on November 10, 1978 in Hollywood, Florida. (PSR ¶ 53). Giovanni and his two siblings, Rosario (age 33) and Rafael (age 30), were born to Salvatore Galluzzo, a retired bricklayer, and Maria Galluzzo, a special education instructor. *Id.* Attached as "Exhibit 2" is a letter from Maria Galluzzo, the defendant's mother, wherein she describes the loving and safe environment in which Giovanni and his siblings were raised. Maria also remembers Giovanni as a helpful child who eagerly assisted his father in laying tile at work. *See* Exhibit 2.

After living in South Florida for five years, Giovanni's family briefly relocated to Brooklyn in 1983, returning to the Miami area in 1984, where they remained until 1988, when they returned to Brooklyn. (PSR ¶ 54). The family maintained a residence in Brooklyn until 1992, when Mr. Galluzzo's father was presented with a job opportunity that prompted the family's return to Florida, this time to the city of Coral Springs. *Id.* Attached as "Exhibit 3" is a letter from Rocco Coluccio, Jr., the defendant's cousin, wherein he emphasizes the irreplaceable role Mr. Galluzzo has played in both his life, and that of his now deceased brother. Also attached, as "Exhibit 4," is a letter from Anna Ingrati, the defendant's Aunt, wherein she recalls some of her favorite memories of Giovanni as a child, many of which occurred while she was visiting the family during their time in Florida.

While in Coral Springs, Giovanni Galluzzo began his freshman year of high school in 1993. (PSR ¶ 67). Due to a learning disability, Giovanni was temporary placed into a special education program, however he was quickly transferred into general curriculum classes due to his academic success. *Id.* Half-way through the academic year, however, Giovanni's father decided to move the family back to Brooklyn. (PSR ¶ 54). Giovanni was then enrolled at Franklin D. Roosevelt High School to finish the remainder of 9th grade. (PSR ¶ 66). While at Roosevelt High School, Giovanni refused to be weighed down by his learning disability and earned multiple awards in recognition of his academic accomplishments. (PSR ¶ 66). In addition to being acknowledged by the New York State Assembly at his graduation in 1997, Giovanni Galluzzo was also presented with the President's Education Award for academic achievement. *Id.* After completing high school with honors, Mr. Galluzzo immediately enrolled in a one-year culinary arts and restaurant management program at the New York Restaurant School in Manhattan from 1998-1999. (PSR ¶ 65). Mr. Galluzzo is also trilingual, speaking fluent English, Spanish and Italian. (PSR ¶ 68).

Mr. Galluzzo's employment history dates back to 1996, a year before his high school graduation. (PSR ¶ 75). Giovanni first worked at Nino's Restaurant in Brooklyn. *Id.* In 1998, while studying at the New York Restaurant School, he was employed as a chef at Coco Pazzo Teatro, a Manhattan restaurant. *Id.* For the first eight months of 1999, Mr. Galluzzo was a chef

2

for Teller's Restaurant in Islip, NY. *Id.* This was followed by a brief period of employment at Towermina Restaurant in Elizabeth, NJ from December 1999 to February 2000. *Id.* In 2006, after being released from incarceration for an unrelated offense he committed at age 21, Mr. Galluzzo resumed employment at a Canadian design firm in New York, where he earned $15.00 an hour. (PSR ¶¶ 45 and 72). In October of 2006, Mr. Galluzzo left the firm and sought admission to the Local 20 Chapter of the Concrete Labor Worker's Union. (PSR ¶ 72).

Mr. Galluzzo has been a member of Local 20 since October of 2006, earning a wage of $35 an hour for all work obtained through the union. (PSR ¶ 69). Due to a decline in market demands for construction work, Giovanni has had to take on various second jobs in recent years, to make up for insufficient work opportunities through the union. *Id.* In 2010, this supplemental income was derived from a part-time pizza delivery job for a pizzeria owned by his wife's family. (PSR ¶ 71). This added $50, plus tips, per week to his income. *Id.* In October of 2011, he earned $300 per week through a management position at Kings County Tattoos, a Brooklyn tattoo shop. (PSR ¶ 70).

Giovanni Galluzzo has no history of mental illness. (PSR ¶ 61). Likewise, he has never battled any form of substance abuse. (PSR ¶ 64). His sober lifestyle has been scientifically confirmed on multiple occasions, through a 2000 sweat patch test, as well as a recent urinalysis, both of which returned negative results. *Id.* Throughout his life, Mr. Galluzzo has also maintained generally good physical health, with two notable exceptions. (PSR ¶ 62). Giovanni does have an allergy to penicillin, which was verified by his primary care physician, Dr. Caruana. *Id.* Additionally, he has a heart murmur, which, although classified as "functional," has caused concern for some of his family members in the past. *Id.* When interviewed by probation, the defendant's wife recalled a 2010 incident when she had to rush Mr. Galluzzo to Maimonides Hospital for emergency room treatment for what, at the time, the couple believed was sudden cardiac arrest. *Id.* Fortunately, this was actually related to a sudden rapid increase in heartbeat related to the murmur. *Id.*

Mr. Galluzzo has lived in Bensonhurst, a middle-income Brooklyn neighborhood, since 2010 with his wife of 5 years, Melissa Galluzzo. (PSR ¶ 54-56). Giovanni and Melissa have been blessed with two children—a three year old daughter and a son who will soon have his first birthday. (PSR ¶ 55). Additionally, the couple recently learned that Melissa is pregnant with their third child. *See* Exhibit 1. Tragically, Mr. Galluzzo has recently been informed that he will be terminated from the Local 20 union as a result of his involvement in the instant matter. (PSR ¶ 69). This burden has been somewhat alleviated by the generosity of Mr. Galluzzo's mother and brother, Rafael, who combine to contribute approximately $1,800 every month to assist Mr. Galluzzo in paying his family's rent and utility bills. *Id.* While Mr. Galluzzo's wife, parents and siblings are aware of his legal situation and remain supportive, his children are unacquainted with the facts surrounding his involvement in the current offense, due to their age. (PSR ¶ 53). Notably, Giovanni Galluzzo has been in full compliance with all of the restrictions required by his pretrial release. (PSR ¶ 60).

## THE PRESENTENCE REPORT:

**Giovanni Galluzzo** has no objection to the following findings and conclusions of the PSR:

- The base level offense for Count 31 is 12 pursuant to § 2E3.1(A)(1)(A).  (PSR ¶ 23).

- The base level offense for Count 47 is 20 pursuant to § 2E2.1(a).  (PSR ¶ 29).

- Since the offense charged in Count 47 involved another party brandishing a knife, a 3 point enhancement is applied pursuant to § 2E2.1(b)(1)(C).  (PSR ¶ 30).

- The defendant was a minor participant with respect to the offense charged in Count 47 and, accordingly, a 2 point reduction is warranted under § 3B1.2(b).  (PSR ¶ 32).

- The adjusted offense level for Count 47 is 21.  (PSR ¶ 34)

- Counts 31 and 47 cannot be grouped pursuant to 3D1.2, making the combined adjusted offense level 21, the greater of the two Counts for which the defendant is currently being sentenced.  (PSR ¶¶ 35-41).

- The defendant is entitled to an additional 3 point downward adjustment pursuant to §§ 3E1.1(a) and 3E1.1(b) for accepting responsibility as demonstrated through his plea of guilty.  (PSR ¶ 42).

- The defendant has 4 criminal history points, placing him in criminal history category III.  (PSR ¶ 47).

**Objections to the PSR** –The objections lodged below are to specific descriptions as set forth in the PSR; the format herein corresponds to that of the PSR, by paragraph:

1. Page 2 (Identifying Data):  Mr. Galluzzo wishes to clarify that he has 3 dependents, his wife and two children, not 2 as stated in the PSR.  He further wishes to clarify that his wife is currently pregnant with their third child and, when born, his number of dependents will be increased to 4.

2. ¶ 15:  Mr. Galluzzo objects to the sentences "Galluzzo …aspired to become an inducted member of the Luchese family.  On July 12, 2010, Galluzzo advised a second cooperating witness that the Luchese family approved of Galluzzo becoming an inducted member and that his induction should happen within six months to a year."  **Mr. Galluzzo does not "aspire" to becoming an inducted member of the Luchese crime family and to his knowledge never told anyone that he expected to be inducted.**

3. ¶ 59 – Mr. Galluzzo objects to the sentence that he was released on an unsecured bond of $300,000.  **He was released on $300,000 bond secured by his mother's house.**

·4

4. ¶ 70 – Mr. Galluzzo objects to the language that he could not recall why he was terminated from the tattoo parlor. **He was let go because business was slow, so there was no work for him.**

5. ¶ 71 - Mr. Galluzzo objects to the language that he could not recall the cause of his termination from a pizzeria owned by his wife's family. **The business was sold, so the position no longer existed.**

6. ¶ 72 - Mr. Galluzzo wishes to clarify that he worked for a Canadian design firm in New York, New York **as an assignment from his half way house prior to his release.** His job location was not in Latham, New York.

7. ¶ 78 – Mr. Galluzzo objects to the language that he declined to complete the Personal Financial Statement. **The statement was reviewed with the Probation Officer, the defendant had no assets or liabilities or net worth.**

8. ¶¶ 43 and 84 –Mr. Galluzzo does not agree with the Guidelines range calculation found in this paragraph of the PSR because it does not include the additional two-point global plea reduction that is a part of the defendant's plea agreement with the Government. Notably, this reduction has already been granted to sentenced co-defendants who plead guilty before the deadline set by the Government. Accordingly, it is Mr. Galluzzo's position that the applicable Guidelines range in his case is 27-33 months, based on an adjusted offense level of 16, which is the offense level after applying the additional two point downward adjustment for the global plea reduction. *See* PSR ¶ 96.

9. ¶ 95 – Mr. Galluzzo objects to the inclusion of conduct other than the counts for which he is currently being sentenced. Namely, this uncharged conduct includes: illegal bookmaking and the distribution of cocaine and firearms. In *United States v. Gigante*, 94 F. 3d 53 (2d Cir. 1996) the Court reviewed a sentence which was greatly enhanced through adjustments and departures based on uncharged and acquitted conduct. Although the Court held that the "preponderance test continues to govern," it was also noted that this preponderance standard is "no more than a threshold basis for adjustments and departures, and the weight of the evidence, at some point along a continuum of sentence severity, should be considered with regard to both upward adjustments and upward departures." *Id.* at 56. The Court then commented that the sentencing Court may assess the facts regarding conduct underlying upward enhancements with a standard "greater than that of preponderance, such as clear and convincing or even beyond a reasonable doubt." *Id.* The information contained in ¶ 95 of the PSR was supplied by unidentified cooperating witnesses and there is no evidence that these allegations were in any way corroborated. Additionally, Mr. Galluzzo has not had the opportunity to confront, cross-examine or otherwise assess the credibility and reliability of this or these witnesses, nor of his or her statements. These are essentially allegations and have not even been established by a preponderance of the evidence. Accordingly, Mr. Galluzzo objects to the use of this information in any way when determining his sentence, as it would be the functional equivalent of punishing him for criminal conduct without the fundamental protections of due process that are firmly rooted in our system of justice. If the Court

decides to impose an upward variance in light of this uncharged conduct, Mr. Galluzzo respectfully asks that the Court balance this enhancement with a downward variance to account for the fact that it is uncorroborated and thus has little weight or value.

## THE APPROPRIATE SENTENCE:

It is respectfully submitted that the Court impose a sentence of 16 months incarceration, following by a period of 8 months home confinement. Title 18 U.S.C, § 3553(a) directs a sentencing Court to impose a reasonable sentence that is "sufficient, but not greater than necessary, to comply with the purposes" of the sentencing factors outline in the subsection. In making this determination, there is a particular need for the Court to consider the history and characteristics of the defendant, since the Guidelines do not account for this important consideration beyond the defendant's criminal history category. *See Rita v. United States,* 551 U.S. 338 at 364-65 and n.3 (2007). Notably, as a term of Mr. Galluzzo's plea agreement, the Government has agreed to take no position concerning where within the Guidelines range determined by the Court his sentence should fall, and make no motion for an upward departure based on information known to the United States Attorney's Office at the time of the agreement's execution. *See* Government's Plea Agreement with Giovanni Galluzzo at page 10, ¶ 12(b) and (c). For the following reasons, it is respectfully submitted that a below Guidelines sentence is appropriate and warranted in Mr. Galluzzo's case.

## (1) The nature and circumstances of the offense and the history and characteristics of the defendant (18 U.S.C. § 3553 (a)(1)).

### (a) Nature and circumstances of the offense

It is indisputable that illegal gambling and conspiring to use extortionate means to collect debt are serious offenses. Mr. Galluzzo assumes full responsibility for having become involved in these offenses. Mr. Galluzzo further regrets that, in failing to exercise proper judgment, he has set a poor example for his children and has disappointed his family, who needs him now more than ever. After considering the circumstances and nature of Mr. Galluzzo's involvement with respect to these particular offenses, however, it is clear that a sentence below the advisory range serves as sufficient and just punishment.

Regarding the gambling charge, Mr. Galluzzo did not hold any supervisory authority over other individuals involved in the operation. (PSR ¶ 16). Furthermore, nothing suggests that this gambling venture operated under an atmosphere of violence, nor do the facts imply any other aggravating circumstances that may otherwise increase the threshold of what constitutes "sufficient" punishment for the offense. A review of the docket sheet reveals that co-defendant Roger Califano (who was also charged with this gambling offense) was sentenced to 16 months, well below the Guidelines range of 24-30 months that applied to his case. With respect to the charge of conspiring to use extortionate means to collect credit, Mr. Galluzzo's involvement was limited to being "present during the assault, although he did not participate." (PSR ¶ 13). In fact, he was granted a downward adjustment in light of his minor role with respect to this offense. Additionally, it is not known whether the victim of this offense suffered any injury. *Id.* Mr. Galluzzo in no way means to suggest that the charged offenses are not serious in nature.

6

These nuances are presented merely to place Mr. Galluzzo's particular involvement within a larger context that, when viewed as a whole, supports a finding that sufficient punishment can be achieved through a sentence that is below the Guidelines range.

### (b)   History and characteristics of the defendant;

Mr. Galluzzo recognizes that this is not his first contact with the criminal justice system and likewise appreciates that both positive and negative portions of his past will be used in determining what constitutes an appropriate sentence. However, he hopes that the Court will not define him only by his past crimes. Just as in high school, when Giovanni refused to let his learning disorder define him, Mr. Galluzzo hopes that he is remembered for eventually moving past life's obstacles, not having been slowed by them. In light of this, Mr. Galluzzo wishes to emphasize the significant amount of time that has passed since his arson conviction in 2000, which took place when he was 21 years old, at a time when he was less mature and less aware of the consequences of his actions. "…Giovanni is truly a good hearted man who…has made mistakes, and has owned up to them. However he is not a malicious person, nor has he ever taught me to be so." *See* Exhibit 3, Letter from Rocco Coluccio.

Since starting a family with Melissa, Mr. Galluzzo's life has taken on new meaning. This is reflected in nearly all of the letters submitted on Mr. Galluzzo's behalf, which are largely a testament to his devotion as a father and dedication as a husband. "Now as a husband and father of two, I have witnessed him caring with his wife and children with extreme tenderness and affection." *See* Exhibit 2. Mr. Galluzzo's mother further recounted that, "[a] few years ago his wife went through an extremely difficult pregnancy with their first child… I was very proud of him because he was very supportive and caring of his wife." *See* Exhibit 2. Mr. Galluzzo's wife expressed similar sentiments, "…I became pregnant…it was an overly extreme situation for me both mentally and physically. Throughout this time Giovanni never left my side. Whether it was midnight trips to the hospital or afternoon runs to the store, my husband did what ever he could to make my life and the life of his future child at ease." *See* Exhibit 1.

Notably, Mr. Galluzzo's involvement in the current offense coincides with a particularly dark period of his life. *See* Exhibit 1, wherein Melissa Galluzzo explains how the joy accompanying the birth of their first daughter was quickly overshadowed by the death of Mr. Galluzzo's cousin. The letter continues, "[t]hese became very troubled times. My husband had just lost his job and my own mother was diagnosed with kidney failure…It took a great toll on our marriage and led to our separation. It was at this time where Giovanni strayed away from [being] a family man and started losing a sense of himself." *See* Exhibit 1. Attached as "Exhibit 5" is a letter from Enza Coluccio, Mr. Galluzzo's aunt and godmother, wherein she echoes Giovanni's role as a caregiver to his family. This letter additionally expresses optimism that "in his family, Giovanni will find the love, support and courage he needs to leave his past behind and live his life to its fullest potential." *See* Exhibit 5. In begging the Court's mercy when "contemplating Giovanni's sentence" she explains that "our family has recently lost so much with the death of our beloved father and the untimely death of my beloved son. We can truly use a miracle to heal our pain." *Id.* Undoubtedly, such struggles do not excuse the defendant's criminal behavior. The unfortunate timing of these difficulties, however, is another aspect of Mr. Galluzzo's background not accounted for by the Guidelines range.

Even beyond his role as a devoted father and husband, much of Mr. Galluzzo's life stands in stark contrast to the conduct at issue. Mr. Galluzzo comes from a well-respected family and has strong community ties, especially to the parish of St. Athanasius Catholic Church. Attached as "Exhibit 6" is a letter from the Monsignor of the St. Athanasius parish, David Cassato, who also serves as a Chaplain for the New York Police Department. Monsignor Cassato's letter is a testament to the Galluzo family's significant involvement within the parish, and specifically refers to Giovanni Galluzzo as a "good person" who "has been a source of help for other people." *See* Exhibit 6. This assistance is not limited to members of the parish, as Mr. Galluzzo's contributions have also been recognized by other leaders within his community. Attached as "Exhibit 7" is a letter from Rabbi Gershon Tennenbaum, the spiritual leader of B'nai Israel. The Rabbi recalls the help Giovanni would provide while waiting for his grandfather-in-law, Al, to finish musical performances at synagogue events. "Giovanni respectfully brought his grandfather and his musical equipment to our events and waited until the affairs ended to take him home. During his waiting time, Giovanni helped out in any way he could. He moved tables and chairs, moved stage props, and especially helped in the preparation and distribution of food." *See* Exhibit 7. Even after Al passed away, "Giovanni continued to help our synagogue and always responded whenever called upon. Always, he was a good hearted volunteer." *See* Exhibit 7. Rabbi Tennenbaum has also taken notice of specific acts of kindness that Mr. Galluzzo has directed at members of his own family. "...[H]e drives his mother-in-law, Mrs. Leonarda (Dina) Califano, to her kidney dialysis sessions every Tuesday, Thursday and Saturday. This...service cannot be appreciated or praised enough." *See* Exhibit 7. Also attached, as "Exhibit 8," is a letter from John Zaremba, an attorney who is close with the Galluzzo family. In his letter, Mr. Zaremba describes Mr. Galluzzo as a "good citizen," and an "asset to his community," in addition to being a "fantastic father...husband and a great friend." *See* Exhibit 8.

**(2) The need for the sentence imposed to: reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant (18 U.S.C. § 3553(a)(2))**

The Guidelines fail to account for the several punitive collateral consequences that will result from Mr. Galluzzo's conviction for the present offense, aside from any period of incarceration. Sentenced offenders often encounter a myriad of punishments other than the sentence explicitly imposed at sentencing. In *United States v. Mateo,* 299 F. Supp. 2d 201 (S.D.N.Y 2004) the Court commented on the true nature of punishment, specifically with respect to its relation to reflecting sound sentencing policy. "There is more to punishment... than the temporal and physical hardships imposed by a sentence as measured by the length of time in prison pre-specified by a [G]uidelines range." The *Mateo* Court then provided examples of these punishments, "... a host of other penalties and burdens always attend criminal conviction, to name a few: losses of family life, of socioeconomic status, of employment and career opportunities; diminution of civil rights and entitlements; and countless humiliations and indignities commonly associated with living in confinement..." *Id.*

As a result of his involvement in the charged offense, Giovanni has already been severely punished by expulsion from the labor union of which he has been a member since 2006. (PSR ¶ 69). This is a crushing blow to the already fragile state of his family's financial security. *Id.* Notably, various Circuit and District Courts have found similar losses worthy of downward variance from the Guidelines. In *United States v. Wachowiak*, 496 F.3d 744 (7th Cir. 2007) the Court imposed a sentence 50 months less than that provided by the Guidelines because "the Guidelines failed to account for the significant collateral consequences the defendant suffered as a result of his conviction. His career…was ruined, he was compelled to resign as a piano teacher and church musician." Likewise, in *United States v. Samaras*, 390 F. Supp. 2d 805, 809 (E.D. Wis. 2005) when determining the appropriate sentence for a defendant convicted of fraud, the Court found that "the loss of a good public sector job" was a significantly punitive collateral consequence that could not be ignored due to the fact that it was "another factor not considered by the Guidelines."

The *Mateo* Court likewise described how "the stings and hardships" of imprisonment can "come to bear extraordinarily more heavily on some inmates than on others" by virtue of "individual circumstances." *Id.* As an example, the Court looked at the effect incarceration has on someone, like Mr. Galluzzo, who is a devoted parent separated from his children, and noted that their punishment "…may fairly be regarded as qualitatively greater than that felt during an equal prison term by a career offender with no family ties for whom jail effectively serves as a primary residence." *Id.* Accordingly, the punitive effect of Mr. Galluzzo's incarceration for the instant offense is greatly enhanced by the fact that it also entails missing the birth of his third child and separation from an environment where he can watch his young children grow during their most formative years. These collateral consequences were not weighing on Mr. Galluzzo's mind during his past periods of incarceration, and, accordingly, a sentence below the range provided by the Guidelines will be highly effective in justly punishing the offense and deterring future criminal conduct.

Unfortunately, an undesirable consequence of Mr. Galluzzo's incarceration is that the resulting separation also serves to unjustly punish his family, specifically his wife and children. Many members of the Galluzzo family have agonized over the potentially devastating effect that Mr. Galluzzo's prolonged absence may have on his children. Mr. Galluzzo's cousin, Rocco, says "[t]he thought of his departure the first time was difficult, but with his wife and children here now, it will be unbearable." *See* Exhibit 3. This valid concern is echoed in the letter from Mr. Galluzo's wife, "[t]here is no one in my own or my children's heart who can replace the love that he brings to us." *See* Exhibit 1. Mrs. Coluccio, the defendant's aunt, confirms Mr. Galluzzo's "important role at home" and further mourns the "devastation his departure will cause." *See* Exhibit 5. Notably, these concerns are not without empirical support. When a parent is incarcerated, their child's life is disrupted. Prison visits can be difficult and as a result, the child and parent fall out of contact and their bond weakens. The negative memories a child associates with such an undesirable situation have been found to put that child at greater risk for poor academic performance, truancy, gang involvement, early pregnancy, drug abuse and other forms of delinquency. *See* Child Welfare League of America, *What Happens To Children?* (2005). This is especially true with regard to Mr. Galluzzo's children, who, as a result of their young age, will remember their father as an inmate, not a devoted father. A recent study found that "parental imprisonment is quite a strong risk factor for both child antisocial behavior and mental

health problems" Joseph Murray, David P. Farrington, Ivana Sekol and Rikke F. Olsen, Effects of Parental Imprisonment on Child Antisocial Behavior and Mental Health: A Systemic Review (Sept. 2009). If such behavioral problems manifest in the defendant's children, the cycle of socially undesirable behavior perpetuates itself, burdening society with more unproductive members. Mr. Galluzzo appreciates that his family's circumstance does not limit his culpability. Rather, this information is cited to support the defense's request of an 8 month period of home confinement to replace what would otherwise be incarceration, with the hopes that is minimizes any harm to the development of his young children.

Further, while past practice took "general deterrence" into consideration while fashioning a sentence, empirical research shows no relationship between sentence length and general deterrence. "Imaginable increases in severity of punishments do not yield significant (if any) marginal deterrent effects. Three National Academy of Science panels, all appointed by Republican Presidents, reached that conclusion, [a]s has every major survey of evidence." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice 1, 28-29 (2006). This is because potential criminals are generally unaware of the penalties for their respective crimes, they do not believe they will be caught or convicted and they "do not consider the consequences the same way a rational decision maker would." *Id.* at 28-29; *see also* Amy Baron-Evans, *Sentencing By Statute*, April 27, 2009, available at http://fd.org/pdf_lib/Sentencing_By_the_Statute.pdf. Accordingly, Mr. Galluzzo should not be given a longer sentence with general deterrence as the justification and the proposed below-Guidelines sentence of 16 months incarceration, followed by a period of 8 months home confinement, is sufficient to promote the aforementioned sentencing goals.

### (3) The need to avoid unwarranted sentence disparities (18 U.S.C. § 3553 (a)(6))

In crafting the appropriate sentence, 18 U.S.C. § 3553(a)(6) directs the sentencing Court to consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." *See United States v. Ebbers*, 458 F.3d 110, 129 (2d Cir. 2006) (finding that remand to the District Court for resentencing is appropriate when there is no evident explanation for disparity between sentences of the defendant and an equally culpable co-defendant). After due consideration of this sentencing factor, it is clear that the proposed sentence of 16 months confinement, followed by 8 months home detention, is warranted under the circumstances of this case.

In addition to Roger Colifano, who pled guilty to racketeering conspiracy and received a 16 month sentence despite an advisory Guidelines range of 24-30 months, other co-defendants who have already been sentenced in this case have likewise received relatively low sentences when compared to the range suggested by the Guidelines. The results of a recent PACER search inform counsel that co-defendant Scott Fappiano was sentenced to time served. Similarly, co-defendant Ali Juseinoski was sentenced to 14 months after pleading guilty to Racketeering Conspiracy. Finally, co-defendant Joseph Carna pled guilty to Counts 15 and 16, each charging him with participation in a money laundering conspiracy. A sentence of 6 months for each count was imposed, to run concurrently. Given that these defendants are similarly situated, and that the differences between them do not tend to portray Mr. Galluzzo as substantially more culpable, the suggested sentence of 16 months incarceration, followed by 8 months home confinement, seems

both reasonable and sufficient, but no greater than necessary, to achieve the sentencing goals of § 3553(a).

## CONCLUSION

Mr. Galluzzo appreciates the seriousness of his offense and is deeply apologetic for his actions. He remains especially remorseful to all parties who were negatively impacted by his offense. Mr. Galluzzo additionally regrets that because of his involvement in the current offense, his pregnant wife and two young children may be harmed by his prolonged absence while serving his sentence. In deciding on an appropriate sentence, Mr. Galluzzo urges the Court to take into account his children and wife, who need him now more than ever. In begging the Court's leniency in deciding her husband's sentence, Mrs. Galluzzo remarked that it would not only be mercy on her husband, "but on my family as well." *See* Exhibit 1. In the words of Mr. Galluzzo's mother, "…I plead you to have compassion on the son who is caring, the husband who is loving and the father who is nurturing." *See* Exhibit 2. Accordingly, Giovanni Galluzzo respectfully requests that the Court impose a below-Guidelines sentence of 16 months incarceration, followed by an 8 month period of home confinement, as it sufficiently reflects the seriousness of the offense and achieves just punishment in a manner which minimizes the amount of time that Mr. Galluzzo's young children will be separated from the father they need in their lives. This sentence will be sufficient but not greater than necessary to meet the factors set forth in Title 18 U.S.C. § 3553(a). To facilitate frequent family visitation, Mr. Galluzzo requests that he serve any period of incarceration at either the Fairington or Schoolkill correctional facilities. The defendant, Giovanni Galluzzo, respectfully reserves the right to raise additional issues at the time of sentencing. Your Honor's attention to and consideration of this submission is greatly appreciated.

Respectfully Submitted,

Margaret M. Shalley

cc:    AUSA Elizabeth Geddes
         *via e-mail – elizabeth.giddes@usdoj.gov*
       USPO Stephen Guttman
         *via e-mail – stephen_guttman@nysp.uscourts.gov*

11

# EXHIBIT 1

To The Honorable Judge Matsumoto;

Your Honor,

My name is Melissa Galluzzo. I am the wife of Giovanni Galluzzo. I am writing this letter to you in an effort to shed some light on the individual that my husband is from a viewpoint much diverse of that which you have been introduced to. I understand fully the circumstances pertaining to my husband and his case, however this letter is intended for your Honor to possibly see the man that I do everyday and find mercy and leniency wherever it may be, not only on my husband but on my family as well.

Giovanni and I have been married for five years and are blessed with 2 beautiful children, and one God-willing on the way very soon. My husband from the day I met him till today has always been a loving, caring, very family oriented individual. The moment I was introduced to his family, they became my own. When I first became pregnant with my oldest, Breanna (3), I suffered from sever anxiety and stress throughout the pregnancy. I was told by doctors prior to my pregnancy that having children would be extremely difficult. As it turned out, I became pregnant, however it was an overly extreme situation for me both mentally and physically. Throughout this time Giovanni never left my side. Whether it was midnight trips to the hospital or afternoon runs to the store, my husband did what ever he could to make my life and the life of his future child at ease.

The time of our child's birth brought great joy to both our lives, but was immediately struck by great despair with the accidental death of my husband's 19 yr. old cousin. The accident was roughly 2 months after our daughter was born and fell on

the day our daughter was to be baptized into the catholic church. This great loss and seemingly spiritual connection between my daughter and husband's cousin weighted heavily on both of us. These became very troubled times. My husband had just lost his job, my own mother was diagnosed with kidney failure, and somehow it was very difficult for either of us to deal with this mass depression that had come over ourselves and our families. It took a great toll on our marriage and led to our separation. It was at this time where Giovanni strayed away from a family man and started losing a sense of himself that he seemed to have such a grip on. Through all of this however, he always had time for his child and always made sure she had everything necessary to live a great childhood life. I feel it was my husbands great sense of family and fatherly duty the brought us back together very soon after our separation, and then led to my second pregnancy which brought our son, Giovanni Jr.(11months). This time, Giovanni truly played the roll of Mommy and Daddy as our daughter, only two years old at the time, needed as much attention and care as I did. And again my husband found a way to do whatever necessary to ensure the safe, healthy arrival of his son, and also safety and security of his family. To me this displayed a man who found no task to difficult or time to tough to stray from family.

My husband grew up in an average household with both loving parents and two brothers. No matter what he did in life he always had the support of his family. He graduated high school and went on to get his degree as a chef at NYRS in Manhattan. Shortly after, still a young individual very susceptible to mistakes, he fell into some trouble with the wrong individuals and unfortunately made mistakes which lead to his incarceration. Though this is true, even at a young age my husband understood what

he did and the repercussions of his actions. As a strong minded individual he went off and sufficiently paid his debt to society (aprox 7 yrs.). Though I did not know him at this time, I know that he went to prison a young boy practically, and came home a grown man. We met shortly after he was released and have been together since. In our time together I have learned much from my husband about the true values of family and friendship. I have witnessed my husband on numerous occasions help  close friends or family members with anything, be it financial, physical, even emotional. He is widely described as a man who has five dollars in his pocket but would give a friend ten if they needed it. Selfishness is a characteristic my husband lacks tremendously.  In all honesty, I am so very thankful to have someone like him in my life. I have suffered with terrible anxiety since early childhood and Giovanni has put so much effort into helping me deal with my condition.  I know few men who come close in upstanding character to my husband. I've never known my husband to hold malice in his heart. He loves unconditionally and is loved without explanation by myself, his children and his family. It is heart breaking for me to even write this letter, because there is no escaping the reality of what is coming.

With all this being said Your Honor, I can tell you for days on end what a great person my husband is. But as I stated earlier, I understand the circumstances of his current situation. He has made mistakes, undoubtably which he has regretted and learned from. Unfortunately no-one is perfect.  It is human nature to make mistakes and wrongful decisions. I understand that he must pay for his mistakes yet again. But I find it very disturbing, and frankly scary to know that my husbands life, future, and future of our family is seemingly dictated by the testimony of individuals who have

been documented to know no value of life. These men have committed terrible crimes against society, taking other individual lives, and yet in an effort to lighten that reality, are willing to say and do whatever to help themselves. I would like you to know Your Honor, that my husband is far from perfect, but just as distant from being anything like these men who stand before him. I know that you have read information about things that were claimed my husband did, as I also read in his PSI report. Things that to me, are simply stated in an effort for one individual to be made to look worse than he who is making the statements. There is no evidence of these added acclimations, yet they are I feel put there to portray my husband as a terrible man. I can only hope and pray that you find it within you to see that my husband is a good man who has made mistakes. But his good far out weighs any mistakes he has made. This letter I write, is from a woman who fears for her family's well being and who in no other way knows how to beg for you leniency towards my husband. I furthermore apologize for us having to meet under such circumstances. I sincerely appreciate you taking the time to read my letter. Lastly, I sincerely ask for your compassion at my husbands sentencing. There is no-one in my own or my children's heart who can replace the love that he brings to us. I am already in pain thinking about the long lonely nights raising my children alone without my best friend at my side. This reality alone, is an everyday nightmare for me. I pray that God gives you all the compassion, fortitude and guidance in making your decision. Thank You and God Bless You.

Sincerely,

Mrs. Melissa Galluzzo

# EXHIBIT 2

To The Honorable Judge Matsumoto;

Your Honor,

I am writing this letter on behalf of my son Giovanni Galluzzo.  Giovanni is one out of three boys. He has always been protective as well as extremely supportive and giving to his family. Giovanni was brought up in an extremely close and loving family.  Giovanni has always been more like an eldest child, protecting his brothers when they were younger and always looking out for them. He has always been diligent and consistent in everything he puts his mind to.

Hard work never discouraged him. Even as a young boy when we lived in Miami, he would go to work with his Dad helping him lay tile at his company. Due to the fact that we had encountered financial problems we moved back to New York and Giovanni then graduated from Franklin Roosevelt H.S. in Brooklyn. At an early age Giovanni had a love of food, so he went on to pursue his dream of becoming a chef. He graduated from New York Restaurant School while in the evening he worked in restaurants making a living. Through this time he not only went to cooking school and worked in the evenings but he also contributed greatly to our

family finances. He assisted us to pay our rent, our food expenses, as well as all our other monthly expenses. He was always a great support to the family unit.

Now as a husband and father of two I have witnessed him caring for his wife and children with extreme tenderness and affection. A few years ago his wife went through an extremely difficult pregnancy with their first child, Breanna. I was very proud of him because he was very supportive and caring of his wife. During this time Giovanni had been working with the union as laborer, unfortunately due to lack of work he was laid off. Like many others he fell on extremely hard times. With the love and support of his family he was able to move forward.

Your Honor, I know my son is a good man, not perfect perhaps a little flawed but nonetheless he has always had good intentions. No matter what happens he is my son and I will always stand by him and his family to give them the love and support that they need. Like all good mothers I want what's best for my son. So I plead with you to have compassion on the son who is caring, the husband who is loving, and the father who is nurturing. I ask on behalf of my son for leniency towards his sentence. May God bless you with the strength and fortitude to make a just decision.

Sincerely,

Maria Luisa Galluzzo

# EXHIBIT 3

To the honorable Judge Matsumoto;

Your Honor,

My name is Rocco Coluccio Jr. I am Giovanni Galluzzo's first cousin. This letter I am writing is in an effort to aid my cousin in any way possible as he has always done for me since I can remember. I can only ask that you can see through all the letters I know my family and friends of Giovanni have written, that Giovanni is truly a good hearted man who for sure has made mistakes, and has owned up to them. However he is not a malicious person, nor has he ever taught me to be so.

Giovanni to me has always been the older brother I never had. From as long ago as I can remember, He has always been there to protect and guide me in my life through the good times and bad. There was never a time that I was in need and called upon my cousin for aid, that I didn't receive it. Growing up in our neighborhood of Bensonhurst Brooklyn was not the easiest task. My father raised me to always use reason over force to resolve a situation. My cousin enforced that teaching upon me. Though it was not easy growing up to avoid confrontation in a neighborhood where everyone for some reason was trying to prove something, I can remember countless confrontations with older teens, where I used every resource of reason I had to avoid physical alteration. I was fortunate to avoid most of all the situations, but a few I was unable to. And it was at these times, that my cousin was always there to protect me.

As you may have already read in the other letters, Giovanni was incarcerated once before. I was a young teen at the time but remember the time distinctly. It weighted heavily on my family as a whole and we were all distraught to see him leave. But as I learned growing up, there is always something to be learned from experience. I know what my cousin did then was wrong, and so did he. The fact that he was willing to admit what he did and take responsibility for his actions, even at such a young age himself, displayed immense character to me. And even when he went off to prison then, there was no shortage of phone calls to me directly to see how I was and have frequent talks about life and always to choose a path wisely, and no matter what you choose, be prepared to accept the consequences. He was not only there for me Your Honor, but also for my younger brother, who passed away in a tragic accident on October 19th of 2008. Sibling relationships are often more difficult than relationships with extended family members. The love my brother and I shared is unexplainable, but the way he admired Giovanni as an older cousin and in a sense older brother as well, left a distinct feeling in Giovanni's heart. My brother was diagnosed with a rare disease at 13 years old and had to receive all kinds of different medical treatment to help him. I have a letter saved from Giovanni that he wrote to my brother in 2003, at the time Giovanni was incarcerated, that urged my brother not to lose faith, that all will be well. It reinsured him that he had a huge family who loved him and would always be there to protect him. It was one of the most touching letters I have every read, and till this days brings tears to my eyes when I read it. I tell you this Your Honor because this is who Giovanni really is. He is a compassionate man. One who holds family love and values at the top of his priority list. A man who can make mistakes, and show the great strength it takes to atone for them. This is Giovanni's core which family makes him the person that I know and love. He gives love to all his family and close friends, and especially his children Your Honor. In knowing my cousin all his life, nothing gives him more happiness

then to be with his children. He loves them unconditionally and it is evident in all that he does for them. He is leaving a big void in their lives and it is with this view that I plead with you to show mercy on him.

Your Honor that I too, along with my family members, am begging for your leniency on his judgment. My cousin has no malice in his heart and is a great contributor both in society and to his family. The thought of his departure the first time was difficult, but with his wife and children here now, it will be unbearable. I understand the severity of his situation, and ask only that you find it in your heart to bestow the most compassionate, just judgment upon him. Thank you and May God bless you.

Sincerely,

Rocco Coluccio Jr.

# EXHIBIT 4

To The Honorable Judge Matsumoto,

Your Honor,

My name is Anna Ingrati. I am writing to you on behalf of my nephew Giovanni Galluzzo. I wish to plead with you for leniency in your judgement for his sentence. I understand that my nephew has made mistakes and has undoubtably made wrong decisions which have brought him to his current situation. I also understand however, that my nephew has come to atone for what he did and take responsibility for his actions. This Your Honor in my opinion defines who my nephew truly is on the inside. A man far from perfect, but someone who takes responsibility for his actions, good or bad. There are not many who would do so in his case and to me it shows upstanding character. With that said I only wish to shed some light on my nephew as the individual I know he is and watched him grow up to become.

Giovanni has always been very special in our family. My favorite memory of Giovanni as a child is that he had one of the most precious baby faces, which even won him a photo contest. He also always had a tremendous love for everyone around him, even his pets. One of my favorite stories that I always seem to tell when the family is gathered together is of Giovanni's innocence and compassion as such a young boy. At the time, Giovanni was about 10 years old and his family was living in Miami. They raised two pet dogs, Paco and Beauty. Paco, the male, was Giovanni's best friend. No matter what Giovanni did to the dog, good or bad, Paco always followed Giovanni and never left his side. While I was visiting one year, the dogs, fully grown, were playing in the yard. As I was preparing food for my nephews, Giovanni came in screaming that Paco was very sick and we needed to call 911. We rushed the dog to the vet and soon after he passed away. Apparently the dog had eaten a poisonous bull frog which intoxicated his system. Giovanni was extremely distraught and saddened by the lost of his best friend. When we returned home with the ashes of the dog Giovanni immediately asked for everyone to come to the backyard. He then instructed everyone through a proper burial ceremony which he conducted. I'll never forget the serious look

on his face while he was giving what seemed to be a last rite from a priest. When he was finished, I asked him his reasoning behind what he had done. He said first, that he had seen it done on a tv show before, and he did it because he felt Paco was one of the family and deserved "A professional funeral, like they did it on the tv when the father died." This story to me displays Giovanni at such a young age having compassion and decency for his friend that he had lost. It warms my heart when I think of that innocent loving boy who has grown to become a loving caring son, grandson, nephew, cousin, husband, and especially father. I stress the father part Your Honor because I know first hand that there is nothing more valuable in Giovanni's life today then his children. He is one of the best fathers I have ever met. He loves his children immensely and would do anything to insure their safety and well being. This love from a father is irreplaceable and Giovanni leaving his children for a long time will leave a tremendous void in both his heart and his children's. Our family has always celebrated in Giovanni's achievements and suffered with him through his mistakes.  I believe when Giovanni applies himself he is capable of creating beauty and flavors in our lives, like no one else can. I know him to be a good person, a wonderful and a terrific husband. Giovanni's character is that of a man, who for love of a friend, would never abandon them in a time of need. In a world who's moral fibers are fast eroding and family values are slowly disappearing, Giovanni has stood by his good family values. So I beg you to consider this when reviewing his case. I ask leniency most of all for his precious and fragile family. May God bless you and guide you to show mercy on my nephew.

Sincerely,

Anna Ingrati

# EXHIBIT 5

To the Honorable Judge Matsumoto;

Your Honor,

My name is Enza Coluccio I am a mother of four children, a wife for thirty years, and a volunteer for seventeen years at my local church. I am godmother and aunt to Giovanni Galluzzo. I have known Giovanni since birth and I honestly believe that there is no malice in his heart. He may be misguided at times but never malicious. When I think of Giovanni, I think of a caring father. One who dotes love and affection on his wife and children. He is the kind of man that a mother would be happy to see her daughter with. Giovanni amazes me in this role as caregiver to his family. For example, from diaper changings, to two am bottle feedings, to doctors well and sick visits he is always at his family's side. It comes natural to him. Your Honor, a family (especially a happy one) is the heart of our society. In this endeavor, Giovanni in my opinion is succeeding. I know that Giovanni is not an angel but he is to his wife and children, so maybe there is hope for him.

However, I am very saddened at the thought of him having to leave his family. He plays such an important role at home that I can only imagine the devastation his departure will cause. Believe me Your Honor, I have first-hand knowledge of loss. At the age of nineteen my beautiful son perished in an accident, so I am well acquainted with devastation. But Giovanni has hope of returning to those who love him and there are plenty of us. In his family Giovanni will find the love, support, and courage he needs to leave his past behind and live his life to his fullest potential. Please, I beg you to consider this when contemplating Giovanni's sentence. Our family has recently lost so much with the death of our beloved father and the untimely death on my beloved son. We can truly use a miracle to heal our pain. May god bless you and your family.

Sincerely,

Enza Coluccio

# EXHIBIT 6



### st. athanasius church
2154 61st street
BROOKLYN, NEW YORK 11204
tel: (718) 236-0124 • fax: (718) 236-4960

March 14, 2012

Re: Giovanni Galluzzo

To Whom It May Concern,

I am writing this letter in behalf of Giovanni Galluzzo of my parish.

Giovanni Galluzzo comes from a good Catholic family. His family is a very good active family in our parish.

I want to say that Giovanni is a good person. Giovanni has tried very much to be involved in parish affairs and has been a source of help for other people.

I am aware of his situation. Please give him every consideration!

Respectfully

Msgr. David L. Cassato

# EXHIBIT 7

בס"ד

# בני ישראל ד'לינדען הייטס

# B'nai Israel of Linden Heights

## 4502 Ninth Avenue, Brooklyn, NY 11220

**Rabbi Gershon Tannenbaum**
*Spiritual Leader*

**Simcha Kopolovich**
*President*

March 19, 2012

Hon. Kiyo A. Matsumoto,
District Court Judge
Eastern District of New York
Federal Court Building
225 Cadman Plaza East
Brooklyn, NY 11201

Re: Giovanni Galluzzo

Your Honor,

Thank you for the opportunity of writing to you on behalf of the above referenced, who is charged with being implicated in an illegal gambling enterprise.

I came to know Giovanni through his wife's grandfather. Giovanni is married for four years, but had been living together for several years before that. The grandfather, Albert Califano was an old-time gentleman as well as an accomplished musician. Amongst all of his music, he mastered many Jewish songs and melodies. He often played at Jewish affairs. I was lucky in that Al, as we knew him, played at our synagogue events whenever called upon without reward or request for recompense. Giovanni respectfully brought his grandfather and his musical equipment to our events and waited until the affairs ended to take him home. During his waiting time, Giovanni helped out in any way he could. He moved tables and chairs, moved stage props, and especially helped in the preparation and distribution of foods. Sadly, Al passed away four years ago. Giovanni continued to help our synagogue and always responded whenever called upon. Always, he was a good hearted volunteer.

For Sabbaths and Jewish holidays, when our membership is restricted in turning lights on or off, or raising the thermostat when it was cold, or turning on air conditioners when it was hot, Giovanni always drops in to see if he could be helpful.

Giovanni is the father of two sweet children, the youngest, baby Giovanni, not yet one year old. In addition, his wife, Melissa is pregnant and due on August 8. Giovanni dutifully attends to as much domestic chores that his wife allows. The four year old daughter, Briana, is taken to and brought home from Catholic parochial school by Giovanni.

Above and beyond all of his family devotion and kindly acts, he drives his mother-in-law, Mrs. Leonarda (Dina) Califano, to her kidney dialysis sessions every Tuesday, Thursday, and Saturday at 9:00 AM, and picks her up at 1:30 PM punctually. This is an indescribable service that cannot be appreciated or praised enough.

This all speaks to the character of the young man and his current inclinations to do good deeds.

He has been employed and worked dutifully as a construction worker for Union Local 20, Concrete Laborers. With maturity, he has successfully completed the New York Restaurant School and earned an Associates Degree in Hotel management and Culinary Arts, in which he feels he can make a major contribution to society. All of his energies and interests are now focused in that direction.

We beg the Court to hear our words and to be lenient in his sentencing. Our entire congregation, as well as his family will be forever thankful.

Respectfully submitted,

Rabbi Gershon Tannenbaum

# EXHIBIT 8

# ZAREMBA BROWNELL & BROWN PLLC

www.zbblaw.com

**The Trump Building | 40 Wall Street, 27th Floor | New York, New York 10005 | Main: 212.380.6700 | Fax: 212.871.6395**

John D. Zaremba
Direct Line: 212.871.6397
E-mail: jzaremba@zbblaw.com

March 15, 2012

**JUDGE KIYO A. MATSUMOTO**
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201
Chambers: Room N40
Courtroom: N4E

I write in regards to Mr. Giovanni Galluzzo whom I understand awaits sentencing before your Honor.

I have known Mr. Galluzzo in a personal and family capacity for many, many years, and hold him in great regard as a friend, family member and as a person. I know Mr. Galluzzo to be a good citizen of this City, an asset to his community, a fantastic father and husband to his family, and a great friend.

I understand that he has been accused of a serious crime, and I do not believe the accusations are consistent with his moral character or his general disposition. Although I do not sit in a position to judge him on these accusations, I can judge him on the many years I have known him to be an outstanding person. For this reason, I ask that you show him as much leniency as allowable under the law.

Thank you for your kind attention to my submission.

Very truly yours,

ZAREMBA BROWNELL & BROWN PLLC

By:

John D. Zaremba, Esq.

JDZ